[No. 37562-8-I. Division One. September 8, 1997.]

CORA E. EDMONDS, *Respondent*, v. JOHN L. SCOTT REAL ESTATE, INC., *Appellant*.

---

■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■

*Douglas S. Tingvall*, for appellant.

*John W. Hathaway* and *Edwards, Sieh, Hathaway, Smith & Goodfriend, P.S.*, for respondent.

---

■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■

---

ELLINGTON, J. — Cora E. Edmonds signed a buyer/broker agreement with an agent of John L. Scott Real Estate, Inc. The agent showed her a house listed by another Scott agent and, after reassurance from the agent that a basement drainage problem would be fixed and warranted, Edmonds signed an earnest money agreement for the purchase of the house.

As the closing date approached, the basement was still wet, and Edmonds demanded the return of her earnest money. Scott's general counsel unilaterally determined, without investigation, that the drainage problem had been fixed. He declared Edmonds in default and disbursed half of her earnest money to the sellers and half to the agents involved in the transaction. Edmonds sued. The trial court found that John L. Scott breached its fiduciary duty with respect to its disbursement of the earnest money, breached the earnest money agreement, was negligent in the preparation of the earnest money agreement, and committed two violations of the Consumer Protection Act (CPA). The court awarded Edmonds damages, including $10,000 in ex-

emplary damages for each CPA violation, and awarded her attorney fees and costs. We affirm all the trial court's determinations of liability and its award of costs, modify the award of exemplary damages, and remand for recalculation of the award of attorney fees.

## FACTS

In 1993, in the course of looking for a home to purchase, Edmonds met with one of Scott's agents, James Tjoa. Tjoa explained that if Edmonds signed a buyer/broker agreement, he would be her agent and work exclusively in her best interests. Edmonds signed, and Tjoa showed her the house at issue in this appeal. The house was listed by another Scott agent, Erma Zimmerman.

Edmonds planned to use the basement of her house as a home office and was concerned about puddles of water she saw in the basement. After speaking with Zimmerman, Tjoa informed Edmonds that the problem would be taken care of and warranted. After Tjoa assured Edmonds that he would draft the necessary documents to guarantee her a dry basement, Edmonds authorized him to prepare an earnest money agreement for the purchase of the house. Tjoa added the following language to the inspection contingency addendum to the earnest money agreement: "Seller to furnish copy of warranty for drainage work done." According to Tjoa, this language was sufficient to ensure a dry basement. Edmonds signed the agreement and paid $5,001 in earnest money. Closing was set to occur between February 17 and February 23, 1994.

The inspection contingency conditioned the agreement on Edmonds' approval of a written general building inspection report. The report confirmed the existence of the water problem in the basement and noted that a sump pump was being installed in the basement. This was the first notice to Edmonds of the existence of, or need for, a sump pump. In the notice of disapproval of the report, Tjoa intentionally made no reference to the basement water

problem on the ground that the language he had added to the inspection contingency sufficiently protected Edmonds' interest.

On January 10, 1994, Zimmerman gave Tjoa and Edmonds a property information form in which the sellers stated that they were not aware of any existing problems with flooding or drainage on the property and that Bodine Construction had corrected a prior problem. Approximately two weeks before closing, but after receiving the property information form, Edmonds discovered a significant amount of water in the basement. She again notified Tjoa who, after talking with Zimmerman, informed Edmonds two days later that Bodine had done more work at the house. Steve Bodine of Bodine Construction told Edmonds that the installation of the sump pump had been a mistake and that additional external work was needed in order to divert water away from the house and solve the problem.

Edmonds called Tjoa daily from January 26 to February 3, 1994 and expressed concern about the water problem. Despite this, Tjoa did nothing to obtain additional warranty information or to determine Bodine's progress in completing the additional drainage work. Soon thereafter, Edmonds notified Tjoa through her counsel that she was terminating the transaction and demanded the return of her earnest money.

Pursuant to standard company practice, Edmonds' file was turned over to Scott's general counsel for handling. Without conducting any factual investigation into Edmonds' complaints regarding the water in the basement, and without undertaking to ascertain whether any warranties covered the work, Scott's counsel unilaterally determined that the drainage problem had been remedied. Less than a week later, the basement flooded again. Nonetheless, Scott's counsel reiterated to Edmonds' counsel

that the drainage problem had been fixed.[1] When Edmonds refused to close on the ground that the water problem had not been fixed, Scott's counsel declared her in default and directed Scott's trust department to disburse half of her earnest money to the sellers and half to Tjoa and Zimmerman.

Edmonds sued Scott, alleging unlawful forfeiture, breach of contract, breach of fiduciary duty, conversion, misrepresentation, fraudulent concealment, and violation of the CPA. After a bench trial, the court found that Scott breached the buyer/broker agreement and the earnest money agreement, its fiduciary duty as Edmonds' agent, and the standard of care owed by a real estate agent in preparing an earnest money agreement and notice of disapproval. The court found that Zimmerman failed to disclose material facts by failing to disclose the extent of the drainage work that had been performed prior to Edmonds' signing the earnest money agreement and by presenting a property information form containing statements she and Tjoa knew were false. These acts by Zimmerman, the court found, violated the CPA. The court also found that Zimmerman breached the earnest money agreement by failing to deliver the warranties as to the drainage work. In addition, the court found that Scott's disbursement of the earnest money constituted conversion, a breach of fiduciary duty, and a violation of the CPA. The court awarded Edmonds the earnest money, interest, exemplary damages for each CPA violation, attorney fees, and costs. Scott appeals the court's determinations of liability and Edmonds cross-appeals the attorney fees award.

## DISCUSSION

### Consumer Protection Act — Disbursement of Earnest Money

 Unfair methods of competition and unfair or

---

[1] In fact, the basement was still flooding months later, even after the property had been purchased by another party.

deceptive acts or practices are unlawful under the CPA. RCW 19.86.020. Actions or transactions within the statutory authority granted to the real estate commission in chapter 18.85 RCW may not be construed to be a violation of the CPA. RCW 19.86.170. Because exceptions to the CPA must be narrowly confined, *Vogt v. Seattle-First Nat'l Bank*, 117 Wn.2d 541, 552, 817 P.2d 1364 (1991), in order to fall within this exception, the particular practice found to be unfair or deceptive must be specifically permitted. *Miller v. U.S. Bank*, 72 Wn. App. 416, 420, 865 P.2d 536 (1994). An action or transaction is not exempt merely because it is regulated generally, *Miller*, 72 Wn. App. at 420, or merely because a regulating agency acquiesces in it, *Vogt*, 117 Wn.2d at 551-52. Rather, the agency must take " 'overt affirmative actions specifically to permit the actions or transactions engaged in' by the person or entity involved in a Consumer Protection Act complaint." *Vogt*, 117 Wn.2d at 552 (quoting *In re Real Estate Brokerage Antitrust Litig.*, 95 Wn.2d 297, 301, 622 P.2d 1185 (1980)).

Scott argues that its method of disbursing earnest money is specifically authorized by WAC 308-124E-013(3) and therefore may not be construed as a violation of the CPA. Under that regulation, if an earnest money agreement terminates according to its own terms prior to closing, disbursements of funds may be made as provided by the agreement without a written release. WAC 308-124E-013(3)(i). Otherwise, no disbursements may be made except as set forth in the agreement without a written release from the purchaser and seller. WAC 308-124E-013(3).

Scott's reliance on WAC 308-124E-013(3) is misplaced. As plainly stated, disbursement without a written release is permitted only when the agreement terminates according to its own terms. An agreement terminates by its own terms only upon the happening of an event specifically identified in the agreement as one that will cause such termination. Emonds' earnest money agreement

enumerates the circumstances under which the agreement automatically terminates.[2] None of those enumerated circumstances encompasses the events leading to Edmonds' decision not to close. The agreement did not terminate by its own terms. Instead, there was an actual dispute as to Edmonds' entitlement to the funds, and Scott had no authority under WAC 308-124E-013(3) to disburse the funds without a written release.[3]

■ Because Scott's practice is not specifically permitted under 18.85 RCW, the next question is whether it violates the CPA. To establish a violation of the CPA, a plaintiff must establish the following elements: "(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; and (5) causation." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986). An act or practice is unfair or deceptive for purposes of the CPA if it has the capacity to deceive a substantial portion of the public. *Hangman Ridge*, 105 Wn.2d at 785; *Sign-O-Lite Signs, Inc. v. DeLaurenti Florists, Inc.*, 64 Wn. App. 553, 561, 825 P.2d 714, *review denied*, 120 Wn.2d 1002 (1992). A misrepresentation made to only one person can have the capacity to deceive many where it is made in a standard form contract. *Henery v. Robinson*, 67 Wn. App. 277, 291, 834 P.2d 1091 (1992), *review denied*, 120 Wn.2d 1024 (1993).

---

[2]The agreement states that it will terminate under the following specific circumstances: if title is not insurable and cannot be made insurable prior to closing, if any improvements on the property are destroyed or materially damaged by fire or other casualty prior to closing, if any part of the property is taken by any public authority under the power of eminent domain prior to closing, or if the seller does not timely agree in writing to correct conditions identified by the purchaser after receiving an inspection report.

[3]We need not address Scott's argument that the trial court should have granted its motion to reopen the case to allow the admission of the Department of Licensing's interpretation of WAC 308-124E-013. The interpretation does not, as Scott suggests, specifically sanction Scott's practice. Rather, it suggests that filing an interpleader action, when the proper party to whom the earnest money should be disbursed cannot be determined, might be the appropriate course of action. Scott did not file an interpleader action with respect to the disbursement of Edmonds' earnest money and thus the Department's interpretation is not relevant to any portion of Scott's argument.

■■ Scott's standard earnest money agreement provides that in the event of default by the purchaser, the earnest money will be forfeited to the seller as liquidated damages. The contract does not disclose, nor do Scott's agents inform purchasers, that in the event of a dispute as to whether the purchaser is in default, Scott's general counsel unilaterally determines whether there was a default and how the earnest money is to be disbursed. It also does not disclose that Scott's general counsel is the sole determiner of whether the matter needs investigating and that a decision as to the merits of the purchaser's complaints may be reached with no investigation whatsoever. Nor does Scott disclose that it has a financial interest in the determination insofar as it is a potential recipient of a portion of the funds if the purchaser is in default. In sum, a purchaser is never informed that, while acting as his or her agent, Scott may simultaneously act not only as the seller's agent but also in furtherance of its own financial interests as well.

All of these undisclosed practices were followed in Edmonds' case. In an unchallenged finding,[4] the trial court found that Scott's counsel conducted no factual investigation into the merits of Edmonds' claims regarding the seller's failure to cure the drainage problem, but nonetheless informed her counsel that the problem had been fixed. In the present case, the problem had not been corrected, as evidenced by the continued flooding of the basement after Scott's counsel declared the problem fixed and Edmonds in default. The unfairness of this practice is self-evident. Further, as Scott acknowledged, it followed this policy dozens, perhaps hundreds, of times in a period of four years, so the practice has the capacity to deceive a substantial portion of the public.

■ Real estate sales clearly constitute "trade" or "commerce" for purposes of the second element of a CPA violation. *See* RCW 19.86.010(2); *Nordstrom, Inc. v. Tampour-*

---

[4]An unchallenged finding is a verity on appeal. *See Moreman v. Butcher*, 126 Wn.2d 36, 39, 891 P.2d 725 (1995).

*los*, 107 Wn.2d 735, 740, 733 P.2d 208 (1987); *Short v. Demopolis*, 103 Wn.2d 52, 61, 691 P.2d 163 (1984).

██ Scott argues, however, that its practice of disbursing earnest money relates to the exercise of its professional judgment, not the entrepreneurial aspects of its services. Scott misinterprets the court's statements in *Haberman v. WPPSS*, 109 Wn.2d 107, 169-70, 744 P.2d 1032 (1987) and *Short*, 103 Wn.2d at 61. The court in those cases distinguished the entrepreneurial aspects of the practice of law from the substantive quality of services such as strategy employed in a particular litigation, and held that the former claims fall under "trade or commerce" as it is defined in the CPA, but the latter do not. This distinction does not apply here. The acts at issue are not analogous to an attorney's decisions regarding strategy in a client's case. Rather, they are part of a practice Scott follows in multiple transactions and fall squarely within the broad scope of the terms "trade" and "commerce" under the CPA.

██ The third element of a CPA violation, public interest impact, is clearly present here. The public interest is impacted by a private dispute where there is a likelihood that "additional plaintiffs have been or will be injured in exactly the same fashion." *Hangman Ridge*, 105 Wn.2d at 790. Scott's "dozens, perhaps hundreds" obviously satisfy this test. Other factors showing public interest, as enumerated in *Hangman*, are also present: the acts were committed in the course of Scott's business, Scott advertises to the public in general, and Scott and Edmonds occupied unequal bargaining positions. *See Hangman Ridge*, 105 Wn.2d at 790-91.

██ The fourth and fifth elements of a CPA violation, injury to the plaintiff and causation, are also present here. Injury and causation are established if the plaintiff loses money because of the unlawful conduct. *Mason v. Mortgage Am., Inc.*, 114 Wn.2d 842, 854, 792 P.2d 142 (1990). Here, Edmonds lost $5,001, and the loss was caused by Scott's unfair practices.

All of the elements necessary to find a CPA violation are thus present with respect to Scott's practice of disbursing earnest money. The trial court did not err in finding that Scott violated the CPA.

### Consumer Protection Act — False Disclosure Form and Misrepresentations

The trial court found that both Zimmerman and Tjoa knew that the sellers' assertions in the property information form—that sellers were aware of no existing problem with the drainage and prior problems had been corrected—were false. The court also found that Zimmerman failed to disclose to Edmonds the extent of the previous drainage work or provide Bodine's 15-year warranty on the drainage work performed the month before Edmonds signed the earnest money agreement. Based on these findings, the court concluded that the presentation of a false property information form is a deceptive and misleading practice that was "compounded" by Scott's failure to disclose material facts concerning ongoing drainage work and warranties, and constituted a violation of the CPA.

These findings were amply supported by substantial evidence. See Sign-O-Lite, 64 Wn. App. at 561. Zimmerman testified that the assertions in the form were false on January 10, 1994, the date the form was presented to Edmonds.[5] Tjoa testified that he was aware of the water in the basement at the time the property information form was presented to Edmonds, but felt that since everyone, including Edmonds, saw the water, "it doesn't matter what it says in here when we saw it already."

---

[5]Zimmerman's testimony on direct examination was:

Q In any event, this was not true at the time that this, was presented to Cora Edmonds, was it, the disclosure that there was [sic] no known existing problems and prior problems had been corrected by Bodine Construction? It certainly wasn't true on the 10th, was it?

A No, not on the 10th, but she was aware of it all the time. So I didn't update this because she was already aware of everything that was happening on the property. So, no I didn't have an update on this.

■ The next question is whether these findings support the conclusion that these activities constituted a violation of the CPA. We find that the four elements of a CPA violation, discussed above, are present here.

The presentation of a property information form containing misrepresentations as to the condition of the property is not only unfair but also has the capacity to deceive the public. The condition of the property as to which the misrepresentation relates may not always be as apparent as a drainage problem, or, as in Edmonds' case, the misrepresentation may mislead a purchaser into believing that the problem is being fixed or minimized and may induce the purchaser into buying property under a false belief as to its condition.

The presentation of the form in the course of negotiations for the purchase and sale of real estate occurred in the conduct of trade or commerce, thus satisfying the second element of a CPA violation. The public interest factor is also present, as evidenced by the trial court's unchallenged findings that Zimmerman gave the subsequent purchaser of the house another property information form she knew contained similar false statements.[6]

The damage and causation elements of a CPA violation are also present. Because of the acts of Scott's agents, Edmonds was induced to believe that the drainage problem was minor and had been corrected. When she realized the contrary, she lost her earnest money.

*Consumer Protection Act — Exemplary Damages*

■■ The trial court assessed the maximum penalty,

---

[6]Specifically, the trial court found that the basement flooded on February 16, 1994, "prompting Zimmerman to meet with Steve Bodine and demand that Bodine provide a solution to the problem that . . . was 'not just another fix.'" Notwithstanding the fact that she clearly had knowledge of the continued existence of a drainage problem, Zimmerman obtained a new property information form from the sellers on February 26, 1994, four days *before* Bodine informed Zimmerman that the work to correct the February 16 flooding had been completed, and the form again stated that no drainage problem existed and that Bodine had cured a previous problem.

$10,000, against Scott for each of Scott's two violations of the CPA. While the equities amply support this result, we conclude that multiple awards of exemplary damages are not authorized by the statute where more than one CPA violation results in a single harm.

The CPA permits the court, in its discretion, to increase the damage award to an amount not to exceed three times the actual damages sustained, up to a maximum award of $10,000. RCW 19.86.090. The award must be based on the party's actual damages. *Sign-O-Lite*, 64 Wn. App. at 565. Although she asserted, and the trial court found, two violations of the CPA, Edmonds nevertheless sustained only one injury as a result of those violations, namely the loss of $5,001 in earnest money. Thus, the awards of exemplary damages were intended to punish Scott for separate acts that resulted in only one injury to Edmonds. The CPA allows the court to increase "the award of damages" up to a maximum of three times the "actual damages" or to $10,000. Because Edmonds incurred the same $5,001 in actual damages as a result of both CPA violations, the trial court had only one "award of damages" to increase.

We recognize the directive that the CPA be liberally construed so as to serve its purposes of protecting the public and fostering fair and honest competition, RCW 19.86.920, and the laudable purposes underlying the treble damages provision, *St. Paul Fire & Marine Ins. Co. v. Updegrave*, 33 Wn. App. 653, 658, 656 P.2d 1130 (1983); *Keyes v. Bollinger*, 31 Wn. App. 286, 297 n.2, 640 P.2d 1077 (1982). However, courts must apply the CPA as written and are therefore limited to a single award of exemplary damages where, as here, multiple violations of the CPA result in a single injury. We therefore modify the trial court's award of exemplary damages under the CPA to a single award of $10,000.

*Breach of Fiduciary Duty — Disbursement of the Earnest Money*

Upon receipt of Edmonds' earnest money, Scott

was required to deposit the funds in an interest-bearing trust account. WAC 18.85.310(6). As trustee of Edmonds' funds, Scott owed her the highest degree of good faith, diligence, fidelity, loyalty, and integrity. *See Wilkins v. Lasater*, 46 Wn. App. 766, 774, 733 P.2d 221 (1987).

Scott's actions leading to its decision to disburse the earnest money to itself and to the sellers are hardly consistent with the fiduciary duty it owed to Edmonds. At the same time it was supposed to be exhibiting the highest degree of fidelity and loyalty to Edmonds with respect to her earnest money, Scott was not only exercising sole decision-making authority over the issue of the disbursement of these funds but also was one of the potential recipients. Scott could protect its own interest only by ignoring Edmonds'. Scott's actions were entirely inconsistent with the duties imposed upon one owing a fiduciary duty to another.[7]

### *Breach of Standard of Care — Preparation of Earnest Money Agreement*

The trial court admitted evidence of Tjoa's negligence in the preparation of the earnest money agreement over Scott's objections that the issue had not been raised by the pleadings. The court denied Scott's motion for a continuance. We find no error in either the admission of this evidence or the denial of the motion for a continuance.

CR 15(b) provides that if evidence is objected to at trial on the ground that it is not within the issues raised

---

[7]We reject Scott's argument that its duty to disburse the earnest money prevailed over its duty to obey Edmonds' instructions once Edmonds defaulted under the earnest money agreement. This argument is based upon the unjustified assumption that the issue of whether Edmonds defaulted was settled at the time the money was disbursed. We also reject Scott's argument that its fiduciary duty to Edmonds ended once the inspection contingency was satisfied. The cases it cites in support of this argument, for example, *Pilling v. Eastern & Pac. Enters.*, 41 Wn. App. 158, 702 P.2d 1232, *review denied*, 104 Wn.2d 1014 (1985), address the issue of the scope of the listing agent's fiduciary duty to the seller. At issue here is Scott's fiduciary duty owed to Edmonds as trustee of her earnest money, not as listing agent. This duty continued until Scott no longer held the funds in trust.

by the pleadings, the court may allow the pleadings to be amended and must "do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits." The rule also provides that the court *may* grant a continuance to enable the objecting party to meet such evidence. CR 15(b). The decision to proceed with the introduction of evidence on a theory which has not been pleaded is addressed to the sound discretion of the trial court and will not be disturbed on appeal absent a manifest abuse of discretion. *Morgan Bros., Inc. v. Haskell Corp.*, 24 Wn. App. 773, 780, 604 P.2d 1294 (1979). The test is whether the opposing party is prepared to meet the new issue. *Bacon v. Gardner*, 38 Wn.2d 299, 305, 229 P.2d 523 (1951).

The record before us reflects that Scott had notice of Edmonds' negligence claim and should have been prepared to meet the issue. For example, the record indicates that the issue of whether Tjoa acted within the standard of care was raised and argued at a summary judgment hearing, that the witness who testified on this issue and the substance of his testimony were duly disclosed to Scott several weeks before trial, and that the issue of negligence had been raised at MAR arbitration. In light of these circumstances, we do not find that the court's allowance of the evidence, or its denial of Scott's motion for a continuance, was an abuse of discretion. Upon the admission of the evidence, the pleadings were amended to conform to the proof. CR 15(b).

Turning to the merits, we find that the trial court's conclusion that Tjoa was negligent in preparing the earnest money agreement is supported by the court's unchallenged findings of fact. The court found that to protect Edmonds' desire for a dry basement, Tjoa inserted the following language into the inspection contingency addendum to the earnest money agreement: "Seller to furnish copy of warranty for drainage work done." The

court also found, in another unchallenged finding, that Tjoa prepared the notice of disapproval of inspection report and intentionally omitted the basement water problem from the notice, telling Edmonds that it did not need to be included because she was already protected by the language he had added to the inspection contingency addendum. The court concluded that these actions by Tjoa fell below the standard of care of an attorney in preparing legal documents relating to the purchase of a residence. We agree.

▉▉ ▉▉ Licensed real estate brokers and salespersons, when completing earnest money agreements, are required to comply with the standard of care of a practicing attorney. *Cultum v. Heritage House Realtors, Inc.*, 103 Wn.2d 623, 631, 694 P.2d 630 (1985). The language Tjoa inserted in the earnest money agreement was insufficient to protect Edmonds' interests with respect to the water problem and fell below the standard of care of a reasonable and prudent attorney in preparing a residential purchase and sale agreement. To protect Edmonds' interests, there should have been an identification of who was doing what work, the right to inspect the work, and to specify when the work was to be completed, the right to require that the work be done to the buyer's satisfaction, an assurance that the warranty was assignable to her, and the availability of other remedies. Further, as illustrated by this litigation, the language inserted by Tjoa was entirely insufficient to protect Edmonds' interest in purchasing a house with a dry basement.

We reject Scott's argument that any negligence on Tjoa's part was not the proximate cause of Edmonds' loss because nothing he could have inserted into the earnest money agreement would have guaranteed a dry basement. It may be true that due to the nature of the drainage system on the property and various other factors, water will always enter and accumulate in the basement. The fact remains, however, that Tjoa could have protected Edmonds' interest by ensuring unquestionably she would

have no obligation if the water problem was not timely rectified.

### Breach of Earnest Money Agreement — Failure to Provide 15-year Warranty

Scott argues that the requirement that Zimmerman furnish the 15-year warranty was a promise, not a condition, and therefore its nonperformance did not excuse Edmonds from performing.[8] We disagree. The provision was added to the list of conditions in the inspection contingency which, if not satisfied, would excuse Edmonds from performing. Although somewhat equivocal, Tjoa's testimony supports the conclusion that the language was intended to be an additional condition, the nonperformance of which would excuse Edmonds from performance and entitle her to a refund of her earnest money.[9]

Contrary to its assertion, Scott's breach of this condition was material. Although Zimmerman provided a warranty on the sump pump Bodine had installed, a warranty on a

---

[8]Scott appears to concede that Edmonds never received this warranty, and we find nothing in the record to indicate to the contrary.

[9]Tjoa testified:

Q Did you place those words in this agreement to satisfy your client's request to make sure she had a dry basement?

A Yes.

Q And this was to protect her so she would not have to close if the basement — the work was not corrected by that time?

A Well, what I was told was that there was a warranty that ensured that the basement was dry. And so that is why I had written it in that we needed a copy of that, and we did receive that.

Q But the words that you have placed here in the middle of this addendum were placed there to protect her from having to purchase the house if it continued to have a drainage problem; is that right?

A I'm sorry?

Q You placed this language in the agreement to protect her so she would be assured of having a dry basement when she bought the house?

A Right, to the best of my ability of what the warranty was there to back up the work, that was done to ensure that the basement was dry.

pump is not a warranty for "drainage work done." As the trial court found in an unchallenged finding, the sump pump warranty "clearly [did] not warrant a dry basement." Scott's failure to comply with the condition was a breach that went to an essential element of the agreement between the parties and was therefore material.[10]

### Award of Attorney Fees and Costs

*Scott's Argument*

Scott disputes the court's award of attorney fees to Edmonds to the extent fees were awarded in connection with her breach of fiduciary duty and negligence claims. It argues that these claims are tort claims, not contract claims, and therefore cannot be encompassed within an award of fees under either the buyer/broker agreement or the earnest money agreement.

■■ ■■ If Edmonds' breach of fiduciary duty and negligence claims were actions "on a contract" then the award of fees was proper. "[A]n action is on a contract for purposes of a contractual attorney fees provision if the action arose out of the contract and if the contract is central to the dispute." *Tradewell Group, Inc. v Mavis*, 71 Wn. App. 120, 130, 857 P.2d 1053 (1993). The negligence claims were based on Tjoa's drafting of the earnest money agreement and his breach of duty to act with due diligence in negotiating the purchase of the property on terms and conditions acceptable to Edmonds. This duty was created under, and defined by, the buyer/broker agreement. The breach of fiduciary duty claims were based on Scott's

---

[10]We reject Scott's argument that Edmonds cannot be excused from performance on the basis of Scott's failure to furnish copies of all warranties on the drainage work because Edmonds was not aware of the existence of other warranties at the time she demanded the return of her earnest money. Assuming Edmonds did not know of the existence of the 15-year warranty, had Tjoa prepared the earnest money agreement without negligence or had he simply asked Zimmerman whether she had produced all the warranties, Edmonds would have been aware of the warranty. Edmonds should not be denied redress where her lack of knowledge was due to her agent's negligent performance of his duties and obligations.

disbursement of Edmonds' earnest money in a manner it claims was set forth in the earnest money agreement. Therefore, the terms of the earnest money agreement and the contractual relationship created by the agreement are central to these claims, rendering them claims "on a contract." It was proper for the court to award fees in connection with these claims under the contractual attorney fees provisions.

■ Scott also disputes the trial court's award of certain costs to Edmonds. The record is insufficient to permit review of this argument. Scott lists the costs Edmonds claimed, but not the costs the court actually awarded. All that is in the record regarding the claims actually awarded is a letter from the court stating that it eliminated "all messenger service, finance charges, travel expense, consultation fee, and deposition expense" from its award of costs. Some of these eliminated costs are among those Scott argues are not proper costs to award. Without an itemization of the costs the court actually awarded, we are unable to address the remainder of Scott's argument.

*Edmonds' Argument*

Edmonds requested $70,400 in attorney fees, but the court awarded only $36,877.50. The court arrived at that figure by determining the attorney fees incurred through arbitration, which it found reasonable, and doubling that amount as an award of fees for the trial de novo. The court determined that after arbitration "it appears that too much time was spent on summary judgment and other matters that were not productive in economically preparing the case for trial de novo." The court "gave consideration to the fact that some additional discovery had to take place and that the defendant was somewhat obstructive and intransigent."

■■ Scott concedes, correctly, that the trial court erred in its method of calculating attorney fees. Under the CPA, attorney fees are calculated by establishing a

lodestar fee and then adjusting it up or down based upon the contingent nature of success and, in exceptional circumstances, based also on the quality of work performed. *Washington State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 334, 858 P.2d 1054 (1993). The same is true with respect to a contractual attorney fees provision. *See Singleton v. Frost*, 108 Wn.2d 723, 730-31, 742 P.2d 1224 (1987); *Metropolitan Mortgage & Sec. Co. v. Becker*, 64 Wn. App. 626, 633, 825 P.2d 360 (1992). The trial court's method of awarding double the fees incurred at arbitration is not consistent with the lodestar method. Accordingly, the matter is remanded for a recalculation of the fees to which Edmonds is entitled.

## CONCLUSION

The trial court's award of exemplary damages under the CPA is reduced to $10,000, and the matter is remanded for a recalculation of the attorney fees award to Edmonds in accordance with this opinion. In all other respects, the judgment of the trial court is affirmed.[11] We award Edmonds attorney fees on appeal; she is directed to comply with RAP 18.1(d).

COLEMAN and AGID, JJ., concur.

Reconsideration denied October 16, 1997.

Review denied at 134 Wn.2d 1027 (1998).

---

[11]In light of our disposition, we reject Scott's argument that it is entitled to a buyer/broker fee.