31 P.3d 698 (2001)
Alberta L. KOCH, Appellant,
v.
MUTUAL OF ENUMCLAW INSURANCE COMPANY and John E. McDermott, Respondents.
No. 46747-6-I.
Court of Appeals of Washington, Division 1.
August 13, 2001.
Publication Ordered September 12, 2001.
*699 Morris H. Rosenberg, Mussehl & Rosenberg, Seattle, for Appellant.
James M. Beecher, Theodore H. Millan, Hacket, Beecher & Hart, Seattle, for Respondents.
PER CURIAM.
At the request of Mutual of Enumclaw (MOE), appellant Alberta Koch's insurer, respondent Dr. John McDermott conducted an independent review of Koch's medical records. Based on Dr. McDermott's report, MOE declined to make payments under Koch's personal injury protection (PIP) coverage for several months. Because Koch failed to establish a genuine factual issue as to whether Dr. McDermott's opinion was dishonest or offered in bad faith, the trial court properly granted summary judgment and dismissed Koch's claims for tortious interference with a contract and violation of the Consumer Protection Act (CPA). We also affirm the trial court's award of attorney fees for a frivolous action, but reverse that portion of the award compensating Dr. McDermott for his time as a litigant.

*700 Facts
Appellant Alberta Koch is an insured under an automobile insurance policy issued by Mutual of Enumclaw. She was injured in a Port of Seattle bus accident on August 17, 1996, and sought treatment from Dr. Martin Tullus. During the following two years, MOE paid $7,900.75 in medical billings under Koch's personal injury protection coverage.
Because Koch's left shoulder pain was not responding to treatment, Dr. Tullus suspected a possible rotator cuff tear and performed exploratory surgery in July 1998. After the operation, MOE contracted with Objective Medical Assurance Corporation and respondent Dr. John McDermott, an orthopedic surgeon, for an independent review of Koch's medical records, including an "assessment whether the treatments are reasonable and necessary and that surgery was warranted and appropriate."
In his report dated August 12, 1998, Dr. McDermott noted that the exploratory surgery had not revealed the suspected rotator cuff tear or labral tear, but that Dr. Tullus had trimmed a prominent acromion,[1] which Dr. McDermott characterized as an "anatomic variant":
With respect to the left shoulder, the patient has an arc type impingement syndrome that was present prior to the accident and subsequently has been managed. At recent surgery only the anatomic variant and bursa were found. There was no evidence of rotator cuff tear or labral tear as had been earlier suspected. The concerns over rotator cuff tear were not borne out in the surgical procedure. Thus, her surgery would represent management of a preexisting problem.
(Emphasis ours.)
After receiving Dr. McDermott's report, MOE advised Koch that it would not release the remaining $2,099.25 in PIP benefits. When Koch threatened a lawsuit, MOE asked Dr. McDermott to review his report. On October 7, 1998, Dr. McDermott provided a supplemental report:
The records document the patient's history, that of tardy presentation for multiple complaints. The patient had complaints to the knees, neck, feet, ankles, low back, and left shoulder. The original concern focused over possible post traumatic patellar femoral syndrome and strain of the foot and ankle. Dr. Tullus does note that the patient had "painful arc" and he initially did not feel that special studies were needed. Subsequently, the patient had an MRI performed which raised the question of anterior [labral] tear.
As noted in my report, the patient at surgery was not found to have a [labral] tear, but rather a congenital variant.
In answering the questions posed at the time of the record review, the concern of possible aggravation of an also-diagnosed "impingement syndrome" was not asked nor addressed. Impingement syndrome is a degenerative change in the acromion that causes rotator cuff compromise and then shoulder symptoms.
It is my belief that the patient on a more probable than not basis could have aggravated or "lit up" the impingement syndrome in the accident as described. This scenario I do not believe was addressed by Dr. Tullus in reviewed records and therefore not commented on.
Based on Dr. McDermott's supplemental report, MOE issued a check for $2,099.25, the balance of Koch's PIP coverage, on October 21, 1998. Koch filed a "Complaint for Breach of Contract, Bad Faith, Violation of the Consumer Protection Act, Misrepresentation, and Tortuous [sic] Interference" against MOE and Dr. McDermott on November 5, 1998.[2]
Koch dismissed her action against MOE on March 12, 1999, after MOE waived most of its subrogation interest in Koch's tort claim *701 against the Port of Seattle, leaving the claims against Dr. McDermott for tortious interference with a contract and for violation of the CPA. Dr. McDermott moved for summary judgment, arguing that his reports to MOE were protected by the qualified "advisor's privilege" set forth in the Restatement (Second) of Torts § 772.
On March 3, 2000, the trial court granted the motion for summary judgment and dismissed Koch's claims. The trial court also found that Koch's action was frivolous and awarded Dr. McDermott $23,782 in attorney fees and expenses under RCW 4.84.185.

Decision
On appeal, Koch contends material factual issues preclude summary judgment dismissal of her claim that Dr. McDermott tortiously interfered with a contractual right. This court reviews an order of summary judgment de novo and determines whether the materials before the trial court, viewed in the light most favorable to the nonmoving party, demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[3]
The elements of tortious interference with a contract or expectancy are: (1) the existence of a valid contractual relationship or business expectancy; (2) the defendant's knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) the defendant's interference for an improper purpose or by improper means; and (5) resulting damage.[4] Koch concedes that in order to establish the fourth element, improper interference, she was required to demonstrate that Dr. McDermott's conclusions were dishonest or offered in bad faith.
Restatement (Second) of Torts § 772 provides:
One who intentionally causes a third person not to perform a contract or not to enter into a prospective contractual relation with another does not interfere improperly with the other's contractual relation, by giving the third person
(a) truthful information, or
(b) honest advice within the scope of a request for the advice.
The court applied this rule in Havsy v. Flynn,[5] although it declined to decide whether § 772 constituted a qualified privilege or described a "specific application of the fourth element of the tort of intentional interference."[6]
In Havsy, the insurer sought an opinion from Independent Medical Services (IMS) as to whether Havsy's charges for treating the insured were reasonable and necessary. After reviewing the insured's medical records, the IMS doctor concluded that some of the treatment provided by Havsy was not necessary or reasonable. Based on the review, the insurer denied PIP payments. Havsy then sued IMS and the reviewing physician for tortious interference with a business relationship. On appeal, the court concluded that under § 772, if Havsy desired to use IMS's advice to the insurer as a basis for establishing intentional interference with a contract or a business expectancy, he was required to allege and prove
without violating CR 11, that the advice was rendered dishonestly or in bad faith; in other words, he must allege and prove facts constituting the fourth element of the pertinent tort, if § 772 describes an element, or an abuse of qualified privilege, if § 772 describes a qualified privilege.[7]
Koch contends that reasonable minds could differ as to whether Dr. McDermott acted dishonestly or in bad faith when he concluded that, with respect to Koch's shoulder, the surgery to trim the acromion "would represent management of a preexisting problem." She asserts that this statement implied she *702 suffered no shoulder injury in the accident and that because Dr. McDermott had performed hundreds of medical examinations for insurance companies in the past and changed his opinion in a supplemental report after she threatened a lawsuit, it is reasonable to infer that he "was trying to anticipate what the insurance company would want to hear" and that he "likely sought to assist MOE in reducing its exposure to Appellant."
But Koch's characterization of Dr. McDermott's initial report as an attempt to assist MOE in denying benefits is not persuasive. The report characterized the ongoing treatment of Koch's knee, ankle, feet, and neck as "reasonable and necessary" and did not suggest that Dr. Tullus's exploratory surgery was unrelated to the accident or otherwise inappropriate or unnecessary.
Moreover, in order to establish an inference of bad faith and dishonesty, Koch relies on the fact that Dr. McDermott had performed numerous independent examinations in the past, stood to gain financially from future examinations, and could be expected to act in a manner to secure future employment. But as Comment C to § 772 expressly notes, if the conditions for application of the rule are otherwise satisfied, "it is immaterial that the actor also profits by the advice or that he dislikes the third person and takes pleasure in the harm caused to him by the advice."
The protection of § 772 would be illusory if the fact that the advisor was paid for the advice automatically raised an inference of dishonesty or bad faith.[8] Koch has not submitted any evidence suggesting that Dr. McDermott's examinations were generally biased in favor of an insurer or have been used with any frequency to deny an insured's claims. Under the circumstances, the mere fact that Dr. McDermott has a financial interest in conducting future examinations does not support an inference of dishonesty or bad faith.
Koch also asserts that the absence of any support in the record for Dr. McDermott's conclusion raises an inference that he acted with malice or "reckless disregard." But there is no dispute that a prominent acromion is a congenital condition that can cause "impingement syndrome" and shoulder pain. Even Dr. Tullus provided no support for Koch's assertion that Dr. McDermott was acting with "reckless disregard." Although Dr. Tullus found that the acromion was "more of a Type 2" than a Type 3 and disagreed with the way Dr. McDermott described the relationship between the injury and the acromion in his supplemental report, he nonetheless characterized Dr. McDermott's original opinion as "just a different opinion that I disagree with." Koch has cited no authority to support the proposition that a mere disagreement between physicians about medical conclusions is sufficient to support an inference of dishonesty or bad faith.
Whether a party has acted in bad faith or dishonestly will generally be an issue of fact. But on the record before us, Koch's allegations of bad faith and dishonesty rest on nothing more than speculation and conjecture. Because there is no genuine issue of material fact on this element, the trial court correctly entered summary judgment on Koch's claim of tortious interference with a contract.
Koch next contends that the trial court erred in dismissing her CPA claim on summary judgment. To establish a claim under the CPA, a plaintiff must prove the following elements: (1) an unfair or deceptive act or practice; (2) occurring in the conduct of trade or commerce; (3) affecting the public interest; (4) injury in business or property; and (5) a causal link between the unfair or deceptive act and the injury.[9] Because there was no evidence supporting an inference of dishonesty or bad faith, Koch failed to establish that Dr. McDermott's actions had the capacity to deceive a substantial portion of the public.[10] Consequently, there was no unfair or deceptive act to support a *703 CPA violation, and the trial court properly dismissed the claim on summary judgment.
Koch contends that the trial court erred in awarding attorney fees and expenses as sanctions under RCW 4.84.185 for a frivolous action. In support of its determination that Koch's claims were frivolous, the trial court found that she had failed to present any evidence that she was damaged by Dr. McDermott's actions, that she presented no evidence of bad faith or dishonesty, and that she cited no legal authority supporting her claims. The court awarded $16,882 in attorney fees and $6,900 to Dr. McDermott for the 46 hours he spent defending himself in the action.
RCW 4.84.185 authorizes the trial court to award to the prevailing party "the reasonable expenses, including fees of attorneys, incurred in opposing" a frivolous action. Such an award is available only when the action as a whole can be deemed frivolous.[11] This court reviews a trial court's award under RCW 4.84.185 for an abuse of discretion.[12]
In order to establish that Dr. McDermott acted dishonestly or in bad faith, Koch relied on the fact that he had a financial interest in providing independent medical evaluations, a circumstance characterized as "immaterial" by Comment C to Restatement § 772. But Koch cited no relevant authority to support this argument. Moreover, Koch's own physician provided no support for her claim that Dr. McDermott's medical conclusion was completely unfounded. Under the circumstances, a determination that Koch's claims were not supported by rational argument on the law or facts was not manifestly unreasonable. The trial court did not abuse its discretion in concluding that Koch's claims were frivolous.
Koch also argues that the award of attorney fees and expenses was unreasonable because MOE voluntarily assumed the costs of Dr. McDermott's defense without a duty to defend. The term "incurred" generally means "to become liable or subject to."[13] But it is undisputed that attorney fees were in fact "incurred" as part of Dr. McDermott's defense. The fact that they were paid by MOE, rather than Dr. McDermott, does not preclude an award under the terms of RCW 4.84.185. Such an award is also consistent with one of the purposes of RCW 4.84.185, which is to discourage frivolous lawsuits.[14]
But we agree with Koch that Dr. McDermott's time as a litigant, for which he received $6,900, is not an expense "incurred" as part of his defense. Dr. McDermott has not alleged that his participation as a litigant subjected him to any liability or obligation to pay. Nor has he cited any authority supporting the award.
In summary, we affirm the order dismissing Koch's claims on summary judgment and the award of attorney fees for a frivolous action. We reverse that portion of the award compensating Dr. McDermott for the time he spent as a litigant.
NOTES
[1] The "acromion" is "the outer end of the spine of the scapula" and "form[s] the outer angle of the shoulder ... articulating with the clavicle." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, 19 (1993).
[2] For reasons not explained by the record, MOE's check was not received by Koch until November 6, 1998. Counsel for Koch returned the check to MOE and requested that it be reissued to the medical insurance company that had paid Koch's surgery expenses.
[3] CR 56(c); Hartley v. State, 103 Wash.2d 768, 774, 698 P.2d 77 (1985).
[4] Leingang v. Pierce Cy. Med. Bureau, Inc., 131 Wash.2d 133, 157, 930 P.2d 288 (1997).
[5] 88 Wash.App. 514, 945 P.2d 221 (1997).
[6] 88 Wash.App. at 520, 945 P.2d 221.
[7] Havsy, 88 Wash.App. at 520, 945 P.2d 221.
[8] See In re Estate of Albergo, 275 Ill.App.3d 439, 448, 656 N.E.2d 97, 211 Ill.Dec. 905 (1995).
[9] Leingang v. Pierce Cy. Med., 131 Wash.2d at 149, 930 P.2d 288; RCW 19.86.090.
[10] See Edmonds v. John L. Scott Real Estate, Inc., 87 Wash.App. 834, 845, 942 P.2d 1072 (1997), review denied, 134 Wash.2d 1027, 958 P.2d 313 (1998).
[11] Biggs v. Vail, 119 Wash.2d 129, 136-37, 830 P.2d 350 (1992).
[12] Kearney v. Kearney, 95 Wash.App. 405, 416, 974 P.2d 872, review denied, 138 Wash.2d 1022, 989 P.2d 1137 (1999).
[13] State v. Goodrich, 47 Wash.App. 114, 117, 733 P.2d 1000 (1987) (statute providing for restitution of actual expenses "incurred" for treatment requires showing that victim obligated to pay).
[14] Biggs v. Vail, 119 Wash.2d at 137, 830 P.2d 350.