[No. 30763-1-I. Division One. August 23, 1993.]

TRADEWELL GROUP, INC., *Respondent,* v. CRAIG A. MAVIS, ET AL, *Appellants,* WILLIAMS & FERGUSON HOLDING COMPANY, ET AL, *Respondents.*

*Allan H. Baris, Andrew C. Gauen,* and *Merrick, Hofstedt & Lindsey,* for appellants.

*W.J. Ferguson* and *Schwabe, Williamson, Ferguson & Burdell; James A. Oliver* and *Short, Cressman & Burgess; William G. Clark* and *Sessions & Monahan,* for respondents.

PEKELIS, A.C.J. — This case arises out of a civil action brought by Tradewell Group, Inc., against Craig A. Mavis and Mavis Foods, Inc., and Wedgwood Center Co., et al.[1] Mavis appeals from the trial court's award of attorney fees and costs in favor of Wedgwood based on the doctrine of equitable indemnity. Wedgwood cross-appeals, contending that the trial court should have awarded additional costs against Mavis and Tradewell.

## I
### FACTS

The following are the facts as found by the trial court. From July 1958 to December 1988, Tradewell operated a grocery store at the Wedgwood Shopping Center in Seattle. In 1987, Tradewell and Wedgwood began negotiating to extend Tradewell's lease which was due to expire in March 1989. Although the parties exchanged a number of draft extensions, the negotiations were suspended after several months.

---

[1] The Wedgwood Center defendants consist of Wedgwood Center, Williams & Ferguson Holding Co., Mr. and Mrs. W.J. Thomas Ferguson, and Mr. and Mrs. Western C.F. Williams.

In early 1988, Tradewell decided to liquidate its entire chain of grocery stores. Realizing that the Wedgwood Center store would have little market value without a long-term lease extension, Tradewell reopened negotiations with Wedgwood. After several meetings, Wedgwood forwarded a lease extension to Tradewell which signed and returned it on March 24.

On April 5 and 7, Tradewell met with Mavis about the possibility of purchasing the Wedgwood store. Mavis owned a nearby competing grocery store and was interested in owning a second store at the more desirable Wedgwood location. At these meetings, Tradewell stated that Wedgwood had signed a long-term lease extension, although Wedgwood had not in fact done so.

On April 12, however, Wedgwood signed and had the lease extension notarized, but decided not to proceed with the deal. Wedgwood had learned of Tradewell's liquidation plans through a newspaper article and was concerned about the quality of Tradewell's buyer. When Wedgwood expressed its concern, Tradewell agreed to allow Wedgwood to negotiate directly with its buyer, Mavis. As a practical matter, Tradewell had little choice since Wedgwood could have simply walked away from the deal, negotiated a lease with another interested party, such as Quality Food Centers, and left Tradewell with essentially nothing to sell.

On April 18, Tradewell telephoned Mavis and told him that if he was still interested in purchasing the Wedgwood store, he should put an offer together by the next day. Mavis timely submitted a written offer to purchase the store for $500,000 plus the value of the store's inventory. Although Tradewell initially replied that it had another offer that was $50,000 higher, it decided to accept when Mavis stood firm. Mavis provided Tradewell with a resumé and financial data and Tradewell, in turn, forwarded the information to Wedgwood.

On May 16, Mavis met with Wedgwood for the first time. Afterward, Wedgwood informed Tradewell that it "liked" Mavis and intended to continue dealing with him directly.

Believing that it had a binding purchase and sale agreement with Mavis, Tradewell told Wedgwood to "go ahead" and actively promoted Mavis as an appropriate successor tenant.

Subsequently, Mavis and Wedgwood held several meetings. During the course of these negotiations two events occurred: First, Wedgwood told Mavis that it considered the lease extension negotiations with Tradewell to be suspended. In fact, Wedgwood stated, wrongly, that it had not even signed the extension agreement. Second, Mavis gave Wedgwood the impression on several occasions that he had an agreement with Tradewell to purchase the Wedgwood store and the deal was ready to close.

On June 10, Mavis and Wedgwood signed a long-term lease for the Wedgwood Center store. Three days later, on June 13, Mavis reduced his offer to Tradewell from $500,000 to $250,000. Tradewell angrily rejected the offer and the parties never reached a final agreement to purchase the store.

In December 1988 Tradewell closed the Wedgwood store and removed all of its own equipment and improvements, resulting in some damage to the premises. Mavis began his tenancy of the Wedgwood store on February 1, 1989.

## Litigation

In November 1990, Tradewell brought suit against both Mavis and Wedgwood. In its amended complaint, Tradewell alleged that Mavis (1) breached a binding agreement to purchase the Wedgwood store, (2) was estopped from denying his obligations under the purchase agreement, (3) was unjustly enriched by causing the value of Tradewell's assets in the store to decrease, and (4) tortiously interfered with Tradewell's contractual/business relations with Wedgwood.

Tradewell further alleged that Wedgwood (1) breached the terms of the undelivered lease extension, (2) was estopped from denying that it promised to execute the lease extension, (3) was unjustly enriched by the Wedgwood/Mavis lease and had decreased Tradewell's value in the Wedgwood Center

store, and (4) tortiously interfered with Tradewell's business relations with Mavis.

Prior to trial, the court dismissed Tradewell's contract claim against Mavis on summary judgment, ruling that Mavis's April 19 offer to purchase the Wedgwood store did not constitute a binding agreement. At the conclusion of trial, the court ruled in favor of the defendants on all of Tradewell's remaining claims.

Following the court's decision, Wedgwood moved for an award of costs and attorney fees against Tradewell and Mavis, contending that it was entitled to its fees under the doctrine of equitable indemnity. The court ordered Mavis to pay $133,301 in costs and attorney fees, finding that Mavis made "false impressions" about the status of his purchase agreement with Tradewell which was a, but not the sole, proximate cause of Tradewell's decision to sue Wedgwood. The court's award did not include the fees and costs Wedgwood incurred in defending against Tradewell's claims for promissory estoppel, tortious interference, and undue influence. The court's award did include, however, $8,500 in attorney fees and $4,000 in costs generated by Wedgwood's efforts to establish its right to equitable indemnity.

Based upon a provision in the lease between Tradewell and Wedgwood, the trial court also ordered Tradewell to pay $77,290 in fees and costs. To prevent a duplicative recovery, however, the court made Mavis and Tradewell jointly and severally liable for Tradewell's portion of the total judgment awarded.

Mavis appeals and Wedgwood cross-appeals from the trial court's award of attorney fees and costs.

## II

Mavis contends that the trial court erred in awarding attorney fees and costs to Wedgwood. Specifically, Mavis argues that the trial court incorrectly concluded that all the elements of equitable indemnity were present here.

The rule in Washington is that absent a contract, statute, or recognized ground of equity, attorney fees will not be awarded as part of the costs of litigation. *Pennsylvania Life Ins. Co. v. Department of Empl. Sec.*, 97 Wn.2d 412, 413, 645 P.2d 693 (1982). One of the recognized equitable grounds under which fees can be awarded is the theory of equitable indemnity. Under this theory, the court may award fees where the natural and proximate consequences of a defendant's wrongful act put the plaintiff in litigation with others and the action generating the expense is instituted by a third party not connected with the original transaction. *Armstrong Constr. Co. v. Thomson*, 64 Wn.2d 191, 390 P.2d 976 (1964). In general, three elements are necessary to create liability which, applied here, would require:

> (1) A wrongful act or omission by A [Mavis] toward B [Wedgwood]; (2) such act or omission exposes or involves B in litigation with C [Tradewell]; and (3) C was not connected with the initial transaction or event, *viz.,* the wrongful act or omission of A toward B.

*Manning v. Loidhamer*, 13 Wn. App. 766, 769, 538 P.2d 136, *review denied*, 86 Wn.2d 1001 (1975).

As an initial matter, we must determine the applicable standard of review. Mavis argues that a trial court's decision that the elements of equitable indemnity have been met is a legal determination subject to independent appellate review. Wedgwood claims, on the other hand, that a court has inherent authority to award fees on equitable grounds and any exercise of that authority is reviewed solely under an abuse of discretion standard.

Mavis's position is persuasive. Whether a particular statutory or contractual provision, or recognized ground in equity *authorizes* an award of attorney fees is a legal question. In the case of the first two bases, the analysis usually is straightforward: the relevant statute or contract either provides for an award of fees or it does not. When equitable grounds are relied on, however, the analysis can be more complicated. For example, in order to award fees under the

theory of equitable indemnification, the evidence must satisfy all three elements of the doctrine. Thus, we review the trial court's factual findings to determine whether they support the court's legal decision to award fees because these elements have been met. *American Nursery Prods., Inc. v. Indian Wells Orchards*, 115 Wn.2d 217, 222, 797 P.2d 477 (1990) (appellate court reviews factual findings to see if they support trial court's legal conclusions). If a legal basis exists for an award, we then review the trial court's determination of the *amount* of fees awarded under the abuse of discretion standard. *See, e.g., Fisher Properties, Inc. v. Arden-Mayfair, Inc.*, 115 Wn.2d 364, 375, 798 P.2d 799 (1990).

With these principles in mind, we first address whether the trial court properly awarded fees in this case. Although Mavis contends that none of the elements of equitable indemnity are present here, our analysis of the second element, that the wrongful act or omission expose or involve B in litigation with C, is dispositive.

The parties disagree as to whether this element is satisfied by a wrongful act that is only a proximate cause of the litigation, or whether it must be the sole cause or something close to it. Our research has found only two cases which specifically address the applicable standard of causation under equitable indemnity, *Stevens v. Security Pac. Mortgage Corp.*, 53 Wn. App. 507, 768 P.2d 1007, *review denied*, 112 Wn.2d 1023 (1989) and *Western Comm'ty Bank v. Helmer*, 48 Wn. App. 694, 740 P.2d 359 (1987).

In *Stevens*, a lender sold a mortgage loan, which had been negligently prepared by a broker, to an institutional investor. When the borrower defaulted, the investor sued the lender for breach of the service contract between them. The lender sought attorney fees from the broker under the theory of equitable indemnity. This court held that because the lender had breached its contract with the investor, the lender could not recover its attorney fees from the broker based on equitable indemnity:

> [The lender] was exposed to the litigation *not only by* [the broker's negligent] conduct, but by its own refusal to replace the loan which constituted a breach of contract.

(Italics ours.) *Stevens*, 53 Wn. App. at 524.

In *Helmer*, a bank foreclosed on a mortgage loan after the borrower defaulted. After the guarantor on the loan confessed judgment and the case was dismissed, the borrower sought equitable attorney fees from the guarantor for her defense of the foreclosure action. The court reversed the trial court's award of fees, holding that the second element of the equitable indemnity test was not established:

> [the borrower] was directly liable on the mortgage and her nonpayment of the mortgage *led* to the foreclosure action. Therefore, we cannot say that [the guarantor's] failure to pay [the borrower] was the *sole* reason [she] was involved in the litigation.

(Italics ours.) *Helmer*, 48 Wn. App. at 701.

■ As these decisions both illustrate, we have consistently held that a party may not recover attorney fees under the theory of equitable indemnity if, in addition to the wrongful act or omission of A, there are other reasons why B became involved in litigation with C. Applying this analysis to the undisputed facts here, the "false impression" created by Mavis that it already had a deal with Tradewell was *not* the only reason for Wedgwood's exposure to litigation with Tradewell.[2] On the contrary, as with the mortgage note in *Helmer* and the loan purchase agreement in *Stevens*, Tradewell sued Wedgwood because they had each signed a lease extension agreement which Wedgwood subsequently refused to deliver. Whether this agreement was valid was a significant issue at trial and clearly a major and independent reason for Tradewell's lawsuit against Wedgwood.

Wedgwood argues that *Helmer* and *Stevens* are distinguishable because in those cases, the parties in Wedgwood's position "[themselves] engaged in wrongful conduct or [were] other-

---

[2]Moreover, the undisputed facts make abundantly clear that in these negotiations, each of the three participants withheld significant information from the other. The trial court, apparently, concluded that Wedgwood was ultimately damaged the most by this pattern of obfuscation.

wise found liable." We disagree that this distinction is significant. In our view, the critical inquiry under the causation element of equitable indemnity is whether, apart from A's actions, B's own conduct caused it to be "exposed" or "involved" in litigation with C. The analysis does not turn on whether the third party actually prevailed in its claims against "A".

Accordingly, since, as the trial court itself recognized, Mavis's conduct was not the only reason for Wedgwood's exposure to litigation, we hold that Wedgwood was not, as a matter of law, entitled to an award of fees under the theory of equitable indemnity. Thus, we reverse the trial court's award of fees to Wedgwood against Mavis in the amount of $133,301.

## III

In its cross appeal, Wedgwood contends that the trial court erred in limiting the award against Tradewell to those costs and attorney fees incurred in defending against Tradewell's breach of contract claim. Wedgwood argues that the court should have also awarded fees for defending Tradewell's claims for promissory estoppel, unjust enrichment, and tortious interference.

The trial court's award of costs and attorney fees against Tradewell was based on paragraph 20 of the parties' original master lease, which was incorporated into the undelivered lease extension. This paragraph states:

> If either party hereby be made or shall become a party to any litigation commenced by or against the other party involving the enforcement of any of the rights or remedies of such party, or arising on account of the default of the other party in its performance of any of the other party's obligations hereunder, then the prevailing party in such litigation shall receive from the other party all costs incurred by such party in such litigation plus reasonable attorneys' fees to be fixed by the court, and together with interest thereon at the rate of six percent (6%) per annum from the date of judgment until paid.

In interpreting this paragraph, the trial court concluded that Wedgwood was only permitted to recover attorney fees and costs for claims arising under the lease. We agree. On its face, paragraph 20 encompasses "any litigation" involving

enforcement of the parties' rights or nonperformance "*here-under*". This language only establishes a right to attorney fees and costs incurred in defending against Tradewell's contract-related claims. Thus, the question becomes whether Tradewell's claims for tortious interference, unjust enrichment, and promissory estoppel were actions on the contract.

Under Washington law, an action is on a contract for purposes of a contractual attorney fees provision if the action arose out of the contract and if the contract is central to the dispute. *Seattle-First Nat'l Bank v. Washington Ins. Guar. Ass'n*, 116 Wn.2d 398, 413, 804 P.2d 1263 (1991); *Western Stud Welding, Inc. v. Omark Indus., Inc.*, 43 Wn. App. 293, 299, 716 P.2d 959 (1986). Here, none of Tradewell's remaining claims against Wedgwood, tortious interference, unjust enrichment, and promissory estoppel, arise out of the undelivered lease extension. The first two claims relate solely to Wedgwood's alleged intervention in Tradewell's business dealings with *Mavis*. The promissory estoppel claim does not arise out of the lease either since estoppel, by its very nature, is an alternative theory of liability based on the *absence of an express agreement. See Hatfield v. Columbia Fed. Sav. Bank*, 57 Wn. App. 876, 885, 790 P.2d 1258 (1990) ("The doctrine of promissory estoppel was developed to cover certain situations in which consideration is lacking").

Accordingly, the trial court did not err in denying Wedgwood's request for attorney fees incurred in defending against Tradewell's noncontract claims.[3] Furthermore, we conclude that by successfully defending the trial court's decision, Tradewell is entitled to its fees on appeal. *Cf. Herzog Aluminum v. General Am. Window Corp.*, 39 Wn. App. 188, 197, 692 P.2d 867 (1984).

---

[3]We also conclude that the trial court did not err in declining to award Wedgwood $3,035 for photocopying expenses. Such expenses are not recoverable as "costs" and can only be recovered to the extent they are included in a reasonable attorney fee. *Nordstrom, Inc. v. Tampourlos*, 107 Wn.2d 735, 743, 733 P.2d 208 (1987). Here, the court apparently determined that the fee award adequately compensated Wedgwood for its photocopying costs.

## IV

Wedgwood next contends that the trial court erred in denying attorney and named defendant Thomas Ferguson's claim for $33,345 in attorney fees. According to Wedgwood, these fees were incurred by Ferguson's effort to assist lead counsel in preparing the case for trial.

Recently, in *Leen v. Demopolis*, 62 Wn. App. 473, 815 P.2d 269 (1991), *review denied*, 118 Wn.2d 1022 (1992), we held that an attorney-respondent was entitled to compensation for his own time spent preparing for appeal. In so holding, we analyzed cases from other jurisdictions and specifically concluded that "[t]he better reasoning supports an award of attorney fees to lawyers who represent themselves." *Leen*, 62 Wn. App. at 487.

However, while attorney fees *may* be awarded in such circumstances, the trial court, as we noted earlier, has discretion in setting the amount of the award. Here, Ferguson never appeared as counsel of record; he examined and defended no witnesses, nor did he argue any positions to the court before or during trial. Furthermore, a review of his time sheets establishes that much of Ferguson's efforts duplicated the work of outside counsel. He spent over 40 hours reviewing pleadings, files, depositions, and drafts of legal documents prepared by his attorneys and logged in 127 hours in "trial preparation" and attendance at trial. Given that the trial court was in the best position to evaluate Ferguson's role and determine the necessity and value of his efforts, it was an appropriate exercise of the court's discretion to deny Ferguson's request for fees.

## V

Wedgwood's final contention is that the long-term lease executed by Mavis and Wedgwood provides an alternative basis for sustaining the trial court's award of litigation expenses. Paragraph 15.3 of the lease states:

Attorneys' Fees. In the event of any controversy, claim, or dispute arising out of or relating to this Lease, or the method in manner or performance thereof, or the breach thereof, said controversy, claim, or dispute shall be resolved in the Superior

Court of the State of Washington for King County or pursuant to arbitration as set forth in § 28.14 below. The prevailing party in the controversy, claim, or dispute, shall be awarded by the court or arbitrators, as the case may be, in addition to any other relief, a reasonable sum as attorneys' fees and costs . . .[.]

This provision does not support Wedgwood's contention. The attorney fees clause only applies to suits "arising out of or relating to *this* Lease". Tradewell's claims against Wedgwood have no bearing on Wedgwood's lease with Mavis. Hence, the attorney fees paragraph of their lease agreement does not apply.

Reversed as to the award of attorney fees to Wedgwood payable by Mavis under equitable indemnity principles; the remainder of the trial court's judgment is affirmed.

SCHOLFIELD and AGID, JJ., concur.