
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

JULIA McCORD, a Washington resident,)
THE CONJUNCTIONAL PATRIOTIC )
SOVEREIGN PATHWAY, and )
RYAN & WAGES, LLC, a Washington )
limited liability company, )
                                  )
       Appellants/ )
       Cross-Respondents, )
                                  )
       v. )
                                  )
CMDG INVESTMENTS, LLC, an )
Oregon limited liability company, )
                                  )
       Respondent/ )
       Cross-Appellant. )
_____)

No. 68946-1-1

DIVISION ONE

UNPUBLISHED OPINION

FILED: November 12, 2013

BECKER, J. — When a party agrees that a person is the manager of a limited liability company at one point in time and binding arbitration has established that he was still the manager at a later point in time, the party is collaterally estopped from bringing another suit to establish that the person was not the manager in the intervening time period, absent some showing of changed circumstances. Because no such showing was made here, we affirm the order of summary judgment dismissing appellants' suit on grounds of collateral estoppel.

The lawsuit included a contract-based claim by the limited liability company and a tortious interference claim by individual members of the company. Because the contract provided only the background out of which the tortious interference claim arose, the court did not err in denying respondent's request to assess attorney fees against the individual members.

## BACKGROUND

Ryan & Wages LLC was formed by Doris Ryan and Tom Wages as a real estate venture in 2004. In December of 2005, Doris Ryan died and her interest passed to her heirs, her daughter Julia McCord and her son Floyd Ryan. Floyd Ryan's interest is held by the "Conjunctional Patriotic Sovereign Pathway." We will refer to McCord, Ryan, and the Pathway collectively as "the heirs." This appeal involves a dispute between the heirs and CMDG Investments LLC, an Oregon limited liability company.

In 2005, Ryan & Wages contracted with CMDG to form Redding Lake Stevens LLC. It is undisputed that Tom Wages was initially the manager of this new entity. The purpose of Redding Lake Stevens was to develop two properties—one in Lake Stevens, Washington, and the other in Redding, California. Ryan & Wages owned the Lake Stevens property and held an option to purchase the property in California. CMDG held 50 Class B units of Redding Lake Stevens. Under the Redding Lake Stevens operating agreement, CMDG's 50 Class B units carried management control and voting rights. Ryan & Wages held 50 Class A units of Redding Lake Stevens, which carried no management control and limited voting rights. Importantly, the Redding Lake Stevens

2

agreement contains a bilateral attorney fee clause awarding costs and fees to any prevailing party in an action to enforce or interpret any provision of the agreement. The Ryan & Wages LLC operating agreement has no such attorney fee provision.

The project in Redding, California, was built, but it turned out that the Lake Stevens property could not be successfully developed due to sewer issues. This reduced the financial prospects for Redding Lake Stevens. As a result, CMDG proposed to amend the Redding Lake Stevens agreement to adjust ownership interests. Wages and the heirs did not agree about how to respond to CMDG's proposal. As a result of this conflict and other concerns regarding Wages' management of Ryan & Wages, in 2008 the heirs sought to add themselves as managers of Ryan & Wages by vote. They purported to act under article 6.4 of the Ryan & Wages agreement, which states that, at a meeting called expressly for that purpose, "any Manager may be removed at any time, with or without cause, by the affirmative vote of Members holding at least two-thirds of all interests in the Company's capital."

Wages, acting as manager of Ryan & Wages, executed the first amendment to the Redding Lake Stevens agreement in February 2009 over the heirs' objections. It was agreed that the Lake Stevens property could not be developed in the manner or on the timeline assumed in the original operating agreement. The amendment guaranteed monthly distributions from Redding Lake Stevens to Ryan & Wages, but it provided that Redding Lake Stevens could stop making these distributions at any time with a lump sum distribution of $1.25

million to Ryan & Wages. Redding Lake Stevens made the lump sum distribution in December 2010.

### FIRST LAWSUIT—ARBITRATION BETWEEN THE HEIRS AND WAGES

In April 2009, Wages filed suit against the heirs, asserting they had acted without authority when they attempted to remove him as manager of Ryan & Wages and to install themselves as managers in his place. The heirs then brought a separate claim against Wages for misappropriation of funds. The two actions were consolidated and, pursuant to a mandatory arbitration clause in the Ryan & Wages agreement, ordered into binding arbitration.

The arbitrator was to resolve, among other issues, management conflicts among Ryan & Wages members. In a decision dated November 25, 2009, arbitrator Tod Nichols found that the heirs' attempt to remove Wages as manager was ineffective:

> The managing member is Tom Wages. The efforts of McCord and Ryan to remove Mr. Wages as managing member are contrary to the LLC Operating Agreement and the amendments thereto. First, there is a contradiction in that paragraph 6.2c.a allows for removal of the managing member by unanimous vote of members owning 60% of the profit interest and 60% of the capital interest in the company, while paragraph 6.4 provides that a manager may be removed by the affirmative vote of members holding at least two-thirds of all interest in the LLC's capital. The specific governs the general and paragraph 6.2c should control.

## SECOND LAWSUIT—THE HEIRS SUE REDDING LAKE STEVENS

One month after the arbitration order was entered, the heirs filed a second suit against Wages, this time adding Redding Lake Stevens as a defendant. As part of this second suit, the heirs petitioned the trial court to remove Wages as manager of Ryan & Wages. Wages counterclaimed for dissolution of the company, which the heirs did not oppose. By order dated January 14, 2010, the court ordered that Wages was removed as manager. The court declined to appoint a new manager in Wages' place. The court dismissed all claims against Redding Lake Stevens on summary judgment and awarded fees and costs to Redding Lake Stevens under the prevailing party attorney fee clause in the Redding Lake Stevens agreement. The heirs' claims against Wages proceeded to trial.

At trial, the main issue involved allocation of the $1.25 million previously distributed to Ryan & Wages by Redding Lake Stevens. The court found that Wages was the managing member of Ryan & Wages when it first formed in 2004. Finding of fact 1. The court also noted that the arbitrator had not removed Wages as manager and found that "Mr. Wages was removed as manager by court order on January 14, 2010." Finding of fact 11. The court ordered judicial dissolution of Ryan & Wages. Finding of fact 6. The court ordered that Wages was not to have any access to the remaining balance of the $1.25 million lump sum that had been distributed to Ryan & Wages. The court authorized the heirs to disburse these funds to themselves to repay their capital account balances after making necessary payments to third party creditors. This decision was

affirmed by this court in <u>Ryan & Wages, LLC v. Wages</u>, No. 68253-9-I, 2013 WL 1164786 (Wash. Ct. App. Mar. 18, 2013).

## THIRD LAWSUIT—THE HEIRS AND RYAN & WAGES SUE CMDG INVESTMENTS

The present appeal is from a third suit in which the heirs are parties. The defendant is CMDG. The complaint brings two causes of action against CMDG, one for breach of contract and one for tortious interference. The two heirs and Ryan & Wages are all designated as "Plaintiff" in the caption of the case.

The complaint alleges that CMDG breached the Redding Lake Stevens agreement by signing the amendment with Wages in February 2009 because CMDG knew or should have known that Wages could not sign on behalf of Ryan & Wages.

The complaint also alleges that CMDG tortiously interfered with the heirs' personal, contractual relationship between themselves and Wages (embodied in the Ryan & Wages agreement) by treating Wages as a speaking agent for Ryan & Wages even though they knew he was no longer a manager of Ryan & Wages.

Both claims were dismissed on summary judgment on the ground of collateral estoppel four months after the complaint was filed. The claims both depend on the factual assertion that Wages was no longer the manager of Ryan & Wages in February 2009 when he signed the amendment. The trial court concluded that prior litigation had already conclusively established that this factual assertion is incorrect; Wages was the manager when he signed the amendment. The heirs and Ryan & Wages (together "appellants") appeal this decision.

The court awarded attorney fees to CMDG against Ryan & Wages for both the breach of contract claim and the tortious interference claim. The trial court declined CMDG's request to impose liability for attorney fees jointly and severally on the heirs personally. CMDG cross appeals the decision rejecting the imposition of joint and several liability on the heirs.

## DISCUSSION

### COLLATERAL ESTOPPEL

We first consider the heirs' contention that they are not collaterally estopped from bringing this action.

Collateral estoppel applies where (1) the issue previously decided is identical to the one presently contemplated, (2) the prior action ended in a final judgment on the merits, (3) the party to be estopped was a party or in privity to a party in the prior action, and (4) the application of the doctrine would not work an injustice. State v. Vasquez, 148 Wn.2d 303, 308, 59 P.3d 648 (2002). The appellants challenge elements one and four only. Appellant's Br. at 17-18.

**Absent a showing of changed circumstances, Wages was manager continuously from formation (2004) to removal (2010)**

Appellants assert that Wages lacked authority to bind Ryan & Wages when he executed the amendment to the Redding Lake Stevens agreement on February 1, 2009, because he was either (1) not the manager of Ryan & Wages or (2) if he was the manager, he lacked authority to execute the first amendment because he failed to get the written approval of members holding at least two-

7

thirds of all capital interests pursuant to article 6.6(g) of the Ryan & Wages agreement. Appellant's Br. at 14-15.

The arbitrator unequivocally concluded in November 2009 that "[t]he managing member is Tom Wages. The efforts of McCord and Ryan to remove Mr. Wages as managing member are contrary to the LLC Operating Agreement and the amendments thereto."

CMDG contends that Wages' authority to enter into the first amendment was resolved by these findings. Appellants argue this is not so because the arbitrator did not specifically find that Wages was the sole manager in February 2009 when the first amendment was executed.

Absent a showing of changed circumstances, a finding of fact at one point in time will be conclusive as to others. Malland v. State, 103 Wn.2d 484, 694 P.2d 16 (1985). In Malland, the Supreme Court considered a consolidated appeal from orders of the Director of Retirement Systems cancelling the disability retirement allowances of both a police officer and a firefighter. Malland, 103 Wn.2d at 485.

The Supreme Court rejected the department's position, concluding "there must be some showing of a change of circumstances before a disability allowance may be canceled." Malland, 103 Wn.2d at 486. Because the department had not shown changed circumstances, collateral estoppel applied:

> "Sometimes, there is a lack of total identity between the matters involved in the two proceedings because the events in suit took place at different times. In some such instances, the overlap is so substantial that preclusion is plainly appropriate. . . . [I]n the absence of a showing of changed circumstances, a determination

that, for example, a person was disabled . . . in one year will be conclusive with respect to the next as well."

Malland, 103 Wn.2d at 489-90 (alterations in original), quoting RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. c (1982).

Under Malland, collateral estoppel bars appellants from claiming, in the present lawsuit, that Wages was not the manager in February 2009. The following facts are undisputed: Thomas Wages became the manager of the Ryan & Wages in 2004 when the entity was formed. Per the arbitrator, Thomas Wages was the sole manager of Ryan & Wages in November 2009. The trial court in the second lawsuit removed Thomas Wages as manager by order dated January 14, 2010. Absent some evidence to the contrary, Wages was the manager continuously from 2004 to January 2010.

Appellants contend the issues are not identical because the arbitrator did not specifically find that Wages was also the manager in February 2009. This is significant, they argue, because they claim they added themselves as co-managers in 2008 pursuant to article 6.2 of the Ryan & Wages agreement. However, the argument that the heirs had made themselves co-managers was an issue before the arbitrator. The arbitrator declined to find that the heirs were co-managers. He found that Wages was "the" manager.

We conclude collateral estoppel applies to bar relitigation of whether Wages was the manager in February 2009.

**As manager, Wages had express authority to sign the first amendment**

Appellants argue in the alternative that even if Wages had been the sole manager when he executed the first amendment in February 2009, his action was ineffective because he failed to comply with article 6.6(g) of the Ryan & Wages agreement.[1]

Article 6.6(g) of the Ryan & Wages agreement places constraints upon the manager's authority to sell assets. The manager may "sell or otherwise dispose of all or substantially all of the assets of the Company" upon a vote of members holding at least a two-thirds interest in the company's capital.[2]

As CMDG correctly points out, the first amendment to the Redding Lake Stevens agreement did not result in a sale of any assets. Before executing the first amendment, Ryan & Wages held 50 Class A shares of Redding Lake Stevens. After executing the amendment, Ryan & Wages still owned 50 Class A shares. The only things that the amendment changed were the calculation and quantity of guaranteed payments due Ryan & Wages. Previously, the payments were to be based on the rent collected as a result of the anticipated development on the Lake Stevens property. After the first amendment, Ryan & Wages would receive payments of $11,000 per month beginning in February 2009 until

---

[1] The parties also refer to this provision as article 8.3. Because we perceive no substantive difference between the two, we will refer to article 6.6(g).

[2] Article 8.3 appears in the section entitled "Rights of Members" and states: "**Approval of Sale of All Assets**. The Members may approve the sale, exchange, or other disposition of all or substantially all of the Company's assets by an affirmative vote of Members holding at least two-thirds of all interests in the Company's capital." Clerk's Papers at 413 (emphasis in original).

10

Redding Lake Stevens made a $1.25 million lump sum payment, a payment that would be triggered by any sale of the Redding Lake Stevens property.

Because the first amendment did not work a sale of all or substantially all the assets of Ryan & Wages, article 6.6(g) is inapplicable. In its absence, the third addendum to the Ryan & Wages agreement controls. The third addendum authorizes the manager "to perform all acts and to execute all necessary documents on behalf of the LLC related to the LLC's membership interest in Redding Lake Stevens, LLC." Wages, who at the time was the manager, had express authority to sign the first amendment.

### Collateral estoppel is consistent with justice because parties had a full and fair opportunity to litigate these issues

Appellants argue that application of collateral estoppel will cause injustice. They say the arbitrator's decision was "at best, vague, ambiguous, and inconclusive" because the "execution of the First Amendment was not central to the arbitrator's decision." Appellant's Br. at 18.

The requirement that application of collateral estoppel not work an injustice rests primarily on whether the prior suit afforded the party a full and fair opportunity to litigate the issue. Robinson v. Hamed, 62 Wn. App. 92, 100, 813 P.2d 171, review denied, 118 Wn.2d 1002 (1991). According to the arbitrator's decision, the parties presented him with eight issues. The arbitrator's decision resolved each issue. In resolving management issues, the arbitrator determined that Wages was "the managing member." The arbitrator necessarily had to decide the merit of the appellants' claim that the heirs added themselves as co-managers in 2007. The arbitrator did not find that Wages was "a" manager but

11

rather found that he was "the" manager. We conclude appellants had a full and fair opportunity to litigate before the arbitrator their claim that the heirs added themselves as co-managers, and the application of collateral estoppel does not work an injustice.

### The relative capital interests of the parties are irrelevant

Appellants finally argue that both collateral estoppel and summary judgment were inappropriate because the arbitrator did not determine the capital interests respectively held by Wages and the two heirs. The issue of capital accounts was before the arbitrator, but it was not decided. The arbitration decision states, "There is insufficient testimony and evidence provided to calculate the capital accounts of the members, nor is such a determination necessary to this decision."

Appellants claim that without information about respective capital interests, it was impossible for the arbitrator to evaluate the effectiveness of the heirs' vote to make themselves co-managers and their vote to remove Wages. They rely on section 6.4 of the Ryan & Wages agreement which states:

> At a meeting called expressly for that purpose, any Manager may be removed at any time, with or without cause, by the affirmative vote of Members holding at least two-thirds of all Interests in the Company's capital.

The arbitrator necessarily considered, and rejected, the heirs' arguments that they were co-managers of Ryan & Wages at the time the first amendment was signed, that determining capital interests was necessary to the decision, and that they had removed Wages as manager in 2008. This is demonstrated by the arbitrator's finding that there is a conflict between the requirements for removal

12

as set out in article 6.2(c)(a) and 6.4, and article 6.2(c)(a) controls because it is more specific. Under article 6.2(c)(a), removal takes an affirmative vote of members owning 60 percent of profit interests and members owning 60 percent of capital interests. The membership interests of the heirs, as found by the arbitrator, totaled only 49 percent. Thus, even without information about the extent of their capital interests, the arbitrator had enough information to find conclusively that the heirs lacked authority to remove Wages.

In summary, the trial court properly dismissed the appellants' suit on summary judgment on the ground of collateral estoppel.

CMDG has filed a motion asking the court to take statements from the heirs' briefs in the second lawsuit as an admission that he was the sole manager in January 2010. Appellate courts may take additional evidence before deciding a case on review if six elements are present. RAP 9.11. The first element requires the additional information to be necessary to fairly resolve the case at issue. RAP 9.11(a)(1). Because the additional information is not necessary to a fair resolution of this appeal, we deny the motion.

**LIABILITY FOR FEE AWARD**

We next consider CMDG's claim that the heirs should have been made personally responsible for the award of attorney fees. The Redding Lake Stevens agreement has a prevailing party attorney fees clause:

> 13.4. ATTORNEYS' FEES. If any legal proceeding is commenced to enforce or interpret any provision of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees at trial and on any appeal (including but not limited to expert witness fees, transcript costs and other similar expenses), in addition to the costs and disbursements allowed by law.

Having prevailed on summary judgment, CMDG moved for an award of attorney fees and costs. The trial court determined that CMDG was the prevailing party as to both claims in the complaint, and the reasonable attorney fees incurred by CMDG were in the total amount of $56,734. The court entered findings of fact and conclusions of law in support of this award.

CMDG contends that the court erred in refusing to impose liability for the fees upon the heirs personally as well as upon Ryan & Wages. Whether the heirs should be made liable for the award of fees was thoroughly briefed and argued in the trial court. The key findings related to this issue are as follows:

> 2. The contract that was the basis for plaintiffs' breach of contract claim, the Redding Lake Stevens, LLC Operating Agreement ("Redding OA"), contains a bilateral prevailing party attorney fee provision in Section 13.4.
> 3. CMDG, as the prevailing party that defeated a breach of contract claim, is entitled to recover its reasonable attorney fees and costs.
>  . . . .
> 8. The assertion that Mr. Wages was not the manager of Ryan & Wages when he signed the First Amendment to the Redding Lake Stevens, LLC Operating Agreement ("First Amendment") was central to both the contract claim and the tortious interference claim asserted by plaintiffs.
> 9. Plaintiffs' tortious interference claim arose out of the claimed breach of the Redding OA, and the breach of the Redding OA was central to that dispute.
> 10. CMDG is entitled to reasonable attorney fees and costs for defending that claim under RCW 4.84.330, and for defending the breach of contract claim.

11. The fees incurred by CMDG would not have been any different if only the breach of contract claim had been asserted. . . .

. . . .

Based on the above findings, the Court enters the following CONCLUSIONS OF LAW:

1. Ryan and Wages, LLC is liable for CMDG's attorney fees and costs awarded under this Order.

In Washington, attorney fees may be awarded when authorized by private agreement. Tradewell Group, Inc. v. Mavis, 71 Wn. App. 120, 126, 857 P.2d 1053 (1993). Whether a specific contractual provision authorizes an award of fees is a question of law reviewed de novo. Tradewell, 71 Wn. App. at 126.

Because the attorney fee provision in the Redding Lake Stevens agreement is bilateral, rather than unilateral, it is the equitable principle of mutuality of remedies which applies in this case rather than the statutory language of RCW 4.84.330. Kaintz v. PLG, Inc., 147 Wn. App. 782, 197 P.3d 710 (2008). Whether the analysis is based on the statute or equity, the issue is the same: whether a dispute is sufficiently related to the contract so as to justify an award of attorney fees to the prevailing party under a prevailing party attorney fee provision. "The general rule is that contractual attorney fees are warranted when the claims asserted are 'on a contract.' An action is 'on a contract' if the action arose out of a contract and if the contract is central to the dispute." 25 DAVID K. DEWOLF, KELLER W. ALLEN, & DARLENE BARRIER CARUSO, WASHINGTON PRACTICE: CONTRACT LAW & PRACTICE § 14.18, at 357-58 (2d ed. 2007) (footnote omitted); see, e.g., Tradewell, 71 Wn. App. at 130.

In support of the assertion that the heirs should be jointly and severally liable for the fee award along with Ryan & Wages, CMDG first argues that the

15

heirs joined Ryan & Wages in asserting the breach of contract claim. Citing the equitable principle of mutuality of remedy, CMDG argues that when the heirs "elected to assert breach of contract claims against CMDG," they also elected to be liable for CMDG's attorney fees when their claims were defeated. Cross-Appellant Br. at 38, citing Kaintz, 147 Wn. App. at 789.

The trial court, however, reviewed the wording of the allegations in the complaint and determined that the heirs did not elect to assert the breach of contract claim.

The complaint lists three plaintiffs in the caption—Ryan & Wages and both heirs. The caption refers to all three entities in the singular as "Plaintiff."

In articulating the breach of contract claim, the complaint alleges that CMDG knew or should have known that Wages was not the manager of Ryan & Wages and could not sign on its behalf, and that CMDG breached the Redding Lake Stevens agreement when it "recognized the purported Amendment as valid." Compl. ¶¶ 4.4, 4.5. The complaint then states, "As a result, Plaintiff has suffered pecuniary losses." Compl. ¶ 4.6.

Next, in articulating the claim for tortious interference with a contractual relationship, the complaint alleges a contractual relationship between the heirs and Thomas Wages through the Ryan & Wages agreement. The complaint alleges that CMDG knew of this contractual relationship and interfered with it by treating Wages as if he were the speaking agent for Ryan & Wages despite knowing that he was no longer a manager, and CMDG thereby disrupted the Ryan & Wages agreement. Compl. ¶¶ 4.7-.10. The complaint then alleges that

16

the two individual heirs suffered damages as a direct result of CMDG's actions. Compl. ¶ 4.11.

The trial court recognized that the complaint was not entirely clear as to whether the heirs as individuals were alleging that CMDG breached the Redding Lake Stevens agreement, but drew the inference that they were not. "There is no breach of contract claim on the Lake Stevens agreement as to those two individuals." Having reviewed the complaint in context, we agree with the trial court's interpretation that the tortious interference claim was the only claim brought on behalf of the heirs personally.

"The court may award attorney fees for claims other than breach of contract when the contract is central to the existence of the claims, i.e., when the dispute actually arose from the agreements." Deep Water Brewing, LLC v. Fairway Res., Ltd., 152 Wn. App. 229, 278, 215 P.3d 990 (2009), review denied, 168 Wn.2d 1024 (2010). CMDG claims that the Redding Lake Stevens agreement was central to the heirs' tortious interference claim.

CMDG relies in part on the trial court's finding of fact 9, stating that the tortious interference claim "arose out of the claimed breach of the Redding OA, and the breach of the Redding OA was central to that dispute." Finding of fact 9 is something of an anomaly, for two reasons. First, if intended as a determination supporting CMDG's request to make the heirs personally liable for the award of attorney fees, it is inconsistent with the court's ultimate decision to deny that request. Second, if intended to reflect the standard articulated in Deep Water Brewing and its antecedents for awarding contractual attorney fees on a

17

noncontract claim, it does not exactly mirror that standard. To say the tortious interference claim "arose out of the claimed breach" of the Redding Lake Stevens agreement is not the same as saying that the tortious interference claim "arose out of" the Redding Lake Stevens agreement. It is unclear, on review, exactly what the trial court meant to resolve by entering finding of fact 8.

Although designated as a finding of fact, finding 8 is more properly characterized as a conclusion of law, and we review it as such. See Scott's Excavating Vancouver, LLC v. Winlock Props., LLC, __ Wn. App. ___, 308 P.3d 791, 795 (2013), citing Willener v. Sweeting, 107 Wn.2d 388, 394, 730 P.2d 45 (1986). A trial court's conclusions of law are reviewed de novo. Sunnyside Valley Irrigation Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003).

The heirs acknowledge that the Redding Lake Stevens agreement would have helped to establish the monetary value of their tortious interference claim had they prevailed on it. The existence of the Redding Lake Stevens agreement explains why CMDG was asking Wages to sign documents. In this respect, however, the role of the Redding Lake Stevens agreement was merely to provide "background." See Hemenway v. Miller, 116 Wn.2d 725, 743, 807 P.2d 863 (1991); Burns v. McClinton, 135 Wn. App. 285, 310, 143 P.3d 630 (2006), review denied, 161 Wn.2d 1005 (2007). It does not establish that the Redding Lake Stevens agreement was central to proving the tortious interference claim.

To be successful on their claim of tortious interference, the heirs needed to prove certain elements related to the Ryan & Wages agreement: (1) the Ryan & Wages agreement was valid, (2) CMDG knew of the Ryan & Wages

agreement, (3) by allowing Wages to sign documents on behalf of Ryan & Wages, they caused Wages to breach the Ryan & Wages agreement, (4) CMDG acted improperly in doing so, and (5) the heirs suffered damage. See Evergreen Moneysource Mortg. Co. v. Shannon, 167 Wn. App. 242, 258, 274 P.2d 375 (2012). The terms of the Redding Lake Stevens agreement are neither material nor central to any of these elements.

CMDG argues that the tortious interference claim was "inseparable" from the breach of contract claim as illustrated by Deep Water Brewing. Cross-Appellant Br. at 43. There, the owner of a restaurant brought suit to enforce provisions in easement and right-of-way agreements that protected his view, and prevailed against homeowners interested in exceeding the height restrictions. The owner was not a party to the original agreements. The trial court awarded the owner attorney fees under prevailing party fee provisions in those agreements, on the theory that the owner was a third party beneficiary of the agreements. The Court of Appeals ruled that the owner was not a third party beneficiary, but nonetheless could enforce the agreements as running covenants protecting the view from the restaurant. Deep Water Brewing, 152 Wn. App. at 278-79. The court stated that "enforcement of the agreements and the claims that followed their breach is the essence" of the owner's claim of tortious interference by the homeowners. Deep Water Brewing, 152 Wn. App. at 279.

This case is not like Deep Water Brewing. It is too much of a stretch to characterize the heirs' claim of tortious interference as an effort to enforce the Redding Lake Stevens agreement. It is true that a single fact, conclusively

19

established in prior litigation, required dismissal of both the tortious interference claim and the breach of contract claim: Wages was not the manager of Ryan & Wages when he signed the first amendment to the Redding Lake Stevens agreement. But that finding did not depend on the terms of the Redding Lake Stevens agreement; rather, it arose out of the Ryan & Wages agreement and the history of disputes among the members of Ryan & Wages.

Another case CMDG cites for support is Edmonds v. John L. Scott Real Estate, Inc., 87 Wn. App. 834, 855-56, 942 P.2d 1072 (1997), review denied, 134 Wn.2d 1027 (1998). In that case, a realtor unlawfully failed to return an earnest money deposit. The prospective buyer prevailed on theories of breach of contract, negligence, breach of fiduciary duty, and consumer protection violation. The buyer-broker agreement and the earnest money agreement had provisions for attorney fees. The trial court awarded attorney fees for claims, not just for the breach of the agreements. The decision to award attorney fees for the tort as well as the contract claims was affirmed on appeal because the terms of the underlying agreements defined the duties on which the claims for breach of fiduciary duty and negligence were based:

> Scott disputes the court's award of attorney fees to Edmonds to the extent fees were awarded in connection with her breach of fiduciary duty and negligence claims. It argues that these claims are tort claims, not contract claims, and therefore cannot be encompassed within an award of fees under either the buyer/broker agreement or the earnest money agreement.
> If Edmonds' breach of fiduciary duty and negligence claims were actions "on a contract" then the award of fees was proper. "[A]n action is on a contract for purposes of a contractual attorney fees provision if the action arose out of the contract and if the contract is central to the dispute." Tradewell Group, Inc. v. Mavis, 71 Wn. App. 120, 130, 857 P.2d 1053 (1993). The negligence

20

> claims were based on Tjoa's drafting of the earnest money agreement and his breach of duty to act with due diligence in negotiating the purchase of the property on terms and conditions acceptable to Edmonds. This duty was created under, and defined by, the buyer/broker agreement. The breach of fiduciary duty claims were based on Scott's disbursement of Edmonds' earnest money in a manner it claims was set forth in the earnest money agreement. Therefore, the terms of the earnest money agreement and the contractual relationship created by the agreement are central to these claims, rendering them claims "on a contract." It was proper for the court to award fees in connection with these claims under the contractual attorney fees provisions.

Edmonds, 87 Wn. App. at 855-56 (alteration in original); see also Western Stud Welding, Inc. v. Omark Indus., Inc., 43 Wn. App. 293, 299, 716 P.2d 959 (1986) (attorney fees properly awarded to prevailing defendant against plaintiff who sued for breach of contract and, in the same lawsuit, alleged that the defendant had tortiously interfered with the same contract).

This case is unlike Edmonds and Western Stud Welding, Inc. The terms of the Redding Lake Stevens agreement did not define or prove the heirs' claim that CMDG tortiously interfered with the Ryan & Wages agreement.

We conclude the tortious interference claim brought by the heirs did not depend in any substantial way upon the existence or terms of the Redding Lake Stevens agreement. We therefore vacate and disregard the trial court's conclusion that the tortious interference claim arose out of the claimed breach of the Redding Lake Stevens agreement and the breach was central to that dispute. The trial court properly denied CMDG's request to make the heirs jointly and severally liable for the award of attorney fees.

Affirmed.

WE CONCUR:

_Becker, J._

_Schindler, J._   _Appelwick, J._